IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SAMTERIOUS GORDON,

                Plaintiff,                    OPINION AND ORDER

  v.

                                          22-cv-78-wmc

K. LOBENSTEIN and
JANUSZ PLUCINSKI,

                Defendants.

---

      Plaintiff and state prisoner Samterious Gordon alleges that defendants Kenneth Lobenstein and Janusz Plucinksi failed to pay him properly and refused to promote him at his prison job because he filed an inmate complaint about his wages.  He contends that defendants' actions amounted to retaliation in violation of his First Amendment speech rights.  Both parties have filed motions for summary judgment.  Defendants' motion will be granted in part and denied in part, while plaintiff's motion will be denied.

      As discussed in more detail below, the undisputed facts show that Gordon was paid properly for the position to which he was assigned.  Thus, he cannot succeed on a retaliation claim based on wrongful wages, and defendants are entitled to summary judgment on that claim.  However, there are genuine factual disputes about whether defendants refused to promote Gordon to a full-time position in retaliation for his inmate complaint, and neither side is entitled to summary judgment on that claim.  As explained below, that claim must be resolved by a jury.

UNDISPUTED FACTS[1]

**I.  Background**

Samterious Gordon was incarcerated at New Lisbon Correctional Institution from December 2016 to May 2022.  From March 2021 to May 2022, Gordon was housed in B-Unit, where defendant Kenneth Lobenstein was the unit manager and defendant Janusz Plucinski was a sergeant.

Each unit at New Lisbon has an allotment of inmate job assignments.  Three job assignments are relevant to this lawsuit: "utility 1, part-time"; "housing unit worker 3, part-time"; and "housing unit worker 3, full-time."  Of the three, the utility 1 assignment is considered a starter position at the prison and is the lowest position on the pay scale, with a pay rate of 1.  Inmates in this position are supervised by the unit sergeant and other staff, and they are primarily responsible for assisting individuals with special needs on an as-needed basis.

The housing unit worker 3, part-time position has a similar job description and duties, but provides more independence and is higher on the pay scale, with a pay rate of 3.  Inmates in this housing unit worker 3 position, part-time are responsible for aiding and assisting in the unit as directed by unit staff and may be required to travel freely around the unit to provide assistance as needed.  Some inmates refer to both of the part-time positions as "weekend runner" positions.  Finally, as it sounds, the housing unit worker 3, full-time position has the same job description as the housing unit worker 3, part-time

---

[1] The following facts are drawn from the parties' proposed findings of facts and responses, and are undisputed except where noted.

2

position, except for the number of hours and schedule worked. The full-time position also has a pay rate of 3.

Until late 2021, job positions were assigned inconsistently between the various housing units at New Lisbon. For example, B-Unit had two utility 1, part-time positions and no housing unit worker 3, part-time positions assigned, while other units had all three. Defendant Lobenstein, who was also on the Inmate Jobs Committee, discussed the inmate job assignment inconsistencies with other unit managers. He then raised the discrepancy in a November 8, 2021, email to Lynn Washetas, the chairperson of the Inmate Jobs Committee, proposing, among other changes, that each unit be allotted two housing unit worker 3, part-time positions. In turn, Washetas brought Lobenstein's proposal to the Inmate Jobs Committee, which voted in favor of adding the new positions. As a result, beginning on November 10, 2021, the housing unit worker 3, part-time position became an official position allotted to B-Unit, along with the two utility 1, part-time positions already available.

## II. Gordon's Job Assignments and Complaints

Meanwhile, in March 2021, Gordon was hired into the B-Unit utility 1 (weekend runner), part-time position, with a pay rate of 1. (Gordon denies that he was ever hired to the utility 1 position, but the contemporaneous documentary evidence shows that his original DOC work assignment was as a utility 1, part-time position, whether he knew it

3

or not. (Dkt. #28-5.))[2] Regardless, sometime in April 2021, Gordon told defendant Lobenstein that he should be paid at a pay rate of 3 for his work as a weekend runner as he had been in another unit, but Lobenstein responded that since Gordon now had a different job assignment, his pay had changed as well. Lobenstein also explained both that he was not responsible for establishing or reviewing pay rates and wages for inmate job assignments *and* there was an ongoing effort by the Inmate Jobs Committee to establish uniformity of the inmate job assignments across the institution.

Gordon next filed an inmate complaint on April 19, 2021, alleging that his "weekend runner" pay was incorrect. He complained that he had been hired as a utility 1, part-time worked on B-Unit with a pay rate of 1, but should have been hired at a pay rate of 3. After verifying that Gordon was receiving the correct pay rate for his assigned position, the inmate complaint examiner dismissed Gordon's complaint. Gordon then appealed, but his appeal was also dismissed.

At that time, there were two housing unit worker 3, full-time positions allotted for B-Unit. In late-April or May 2021, one of those full-time positions became available. Generally, unit sergeants made hiring decisions, with unit managers reviewing and approving their decisions. In this instance, defendant Plucinski was the sergeant responsible for posting and hiring an inmate for the position, with his decision being sent to defendant Lobenstein for final approval. According to Lobenstein, he gave his unit sergeants the autonomy to select the candidate that they felt was best suited for the

---

[2] In a different unit, Gordon had previously worked in a housing unit worker 3, part-time position, and he may have thought that his B-Unit utility 1 job was equivalent to work he had done previously, for pay purposes.

position, as they would have the most experience with the inmates and were the staff who would be working closely with the inmate. (Lobenstein Decl. (dkt. #28) ¶ 65.) Thus, his role was generally limited to reviewing the supervisor's selection and approving it, so long as "there were no outstanding issues with the candidate." (*Id.* ¶ 66.)

However, Lobenstein made an exception to his general practice with respect to the open full-time housing unit 3 position in B-Unit on the Spring of 2021, representing in his declaration at summary judgment that after reviewing Gordon's previous work history and conduct report history, he directed the sergeants on B-Unit *not* to hire Gordon for the open position. Moreover, he did so even before any hiring recommendation was made by Sergeant Plucinski. (*Id.* ¶ 85.) Without explaining what prompted him to investigate Gordon's background, Lobenstein declares that he gave this direction based on: (1) Gordon's April 2019 termination from a housing unit worker 3, part-time position on A-Unit, which was the result of staff input and a particularly poor work evaluation from another sergeant;³ (2) staff members on B-Unit informing him that Gordon was difficult to work with and that his overall work performance in the utility 1 position was lacking, including sergeants who reported Gordon did not show up for assigned shifts and pawned work off to other inmates so he could play cards or go to recreation; and (3) Gordon's history of conduct reports. The latter included: an April 2020 conduct report for disobeying orders, being in an unassigned area, and lying to staff; a June 2020 conduct

---

³ Gordon argues that defendants should not be permitted to rely on this previous termination because he "settled" a case against the sergeant who terminated him. (Dkt. #38.) However, Gordon cites nothing in the settlement agreement stating that his record should be expunged or that would otherwise prohibit defendants from considering the termination in evaluating future job assignments for Gordon.

report for unauthorized forms of communication and disobeying orders; an August 2020 conduct report for assaulting an inmate and disruptive conduct; and a November 2020 conduct report for missing routine count.[4]

Defendant Plucinski also declares that he had concerns about Gordon handling a full-time position, based on his own observations of Gordon in the part-time utility 1 position, as well as conversations with staff familiar with his work performance. Specifically, Plucinski represents that he personally observed Gordon pass off shifts to other inmates and other staff reported that Gordon failed to stay at his assigned post during scheduled shifts, failed to travel quickly or efficiently, and had a poor attitude with staff and co-workers. Plucinski states that he was also concerned about Gordon's termination from his part-time position on A-Unit and Gordon's conduct reports. However, Gordon disputes defendants' characterization of his work ethic; he also asserts that because Plucinski worked the first shift, he never actually observed Gordon working his weekend shift.

Regardless, according to defendants, Sergeant Plucinski hired another inmate, Matthew Pfendler, for the full-time housing unit worker 3 position on June 13, 2021, who had worked in an equivalent full-time position while housed on A-Unit, with satisfactory performance. In contrast, plaintiff Gordon maintains that Plucinski actually hired at least one other inmate for the position before hiring Pflender, and did so without posting the available position to the unit as required by policy. Moreover, defendants do not respond

---

[4] Lobenstein also cites complaints about Gordon's performance after November 2021 and an August 2021 conduct report, but that information is largely irrelevant to the promotion decision at issue here, which occurred in May or June 2021.

6

to plaintiff's assertions regarding the posting or timing of the hiring decision, and Lobenstein's interrogatory responses appear to provide support for Gordon's position, as they identify another inmate who held the position between April 25, 2021 and May 27, 2021. (Dkt. #35-4. ¶ 2.)

According to Gordon, he also confronted both Lobenstein and Plucinski after they failed to hire him for this full-time position. Gordon further represents both defendants responded by saying that he was not promoted because he kept filing requests and complaints about his pay, and they also threatened to fire him if he continued to complain. Defendants deny that this encounter ever occurred.

Approximately five months later, on November 28, 2021, Gordon was reassigned to the housing unit worker 3, part-time position that was newly allotted to the B-Unit. Gordon was paid at a pay rate of 3 from that point forward. He subsequently filed an inmate complaint requesting back-pay for the time he was in the utility 1, but his complaint was dismissed. Gordon then remained in the housing unit worker 3, part-time position until his transfer from New Lisbon in May 2022.

OPINION

As noted, the parties have filed cross motions for summary judgment on plaintiff's First Amendment retaliation claim, while defendants also move for summary judgment on plaintiffs' request for compensatory and punitive damages. The court first addresses the merits of plaintiffs' claims, then turns to plaintiff's damages requests and the upcoming trial.

### I. First Amendment Retaliation

Plaintiff contends that defendants Lobenstein and Plucinski denied him proper wages and refused to promote him to a full-time position because he filed an inmate complaint about his wages. The Constitution prohibits prison officials from retaliating against an inmate for engaging in activity protected by the First Amendment. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012). To succeed on a First Amendment claim, a prisoner must show that: (1) he engaged in activity that was constitutionally protected; (2) the defendant's conduct was sufficiently adverse to deter a person of "ordinary firmness" from engaging in the protected activity in the future; and (3) the defendant subjected the plaintiff to adverse treatment because of the plaintiff's constitutionally protected activity. *Bridges v. Gilbert*, 557 F.3d 541, 556 (7th Cir. 2009).

Here, the parties agree that plaintiff engaged in activity protected by the First Amendment when he filed grievances challenging his prison wages, so the court will assume his grievance was protected, at least for purposes of summary judgment. *See Holleman v. Zatecky*, 951 F.3d 873, 878 (7th Cir. 2020) (prison complaints about conditions of confinement are protected activities); *but see Herron v. Meyer*, 820 F.3d 860, 864 (7th Cir. 2016) (questioning whether the First Amendment protects a prisoner's personal, workplace grievances). On the second element, plaintiff's claim that he was denied *proper wages* in retaliation for his filing of a grievance fails because the undisputed evidence shows that plaintiff was paid appropriately at all times for the specific position to which he was assigned. Because plaintiff received proper wages, he was not subject to any adverse action by defendants that would support that claim.

8

In contrast, plaintiff's evidence satisfies the second element of his claim that he was denied *a promotion* for retaliatory reasons, as a refusal to promote an inmate to a prison job that would provide significantly more hours and greater pay could deter a person of ordinary firmness from engaging in protected activity. *See Douglas v. Reeves*, 964 F.3d 643, 648 (7th Cir. 2020) ("denial of a prison job that would impart such palpable benefits could certainly deter First Amendment activity"); *McElroy v. Lopac*, 403 F.3d 855, 858 (7th Cir. 2005) (loss of prison job sufficiently adverse).

The more difficult question is whether plaintiff's evidence is sufficient to create a genuine dispute of material fact regarding defendants' alleged motivation for denying plaintiff the promotion to the full-time housing unit worker 3 position. Certainly, most of the evidence suggests that Plucinski's hiring decision had nothing to do with plaintiff's wage complaint. First, Plucinski himself was not contacted about Gordon's earlier wage complaint, and neither defendant was responsible for setting wages for job assignments. Thus, plaintiff's wage complaint was not actually critical of either defendant, and the outcome of his complaint had no effect on either one way or another. Second, despite plaintiff's assertion that defendants threatened to fire him, he was not terminated from his position, but was instead transferred to a higher paying housing unit worker 3, albeit part-time position as soon as it became available on B-Unit. In short, neither defendant had any obvious motivation for holding retaliatory animus toward plaintiff.

Still, plaintiff swears defendants *told him* that his promotion to a full-time position was denied because of his inmate complaint. On a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party and may not

weigh the evidence, even when it seems like the facts and inferences appear to lead more strongly to one conclusion than another. *Gupta v. Melloh*, 19 F.4th 990, 996–97 (7th Cir. 2021). Here, if a jury were to accept plaintiff's version of his exchange with defendants, they could reasonably conclude he was denied the promotion in retaliation for his complaining about his wages. Thus, plaintiff's affidavit describing the encounter is sufficient to satisfy the third element of his prima facie case. *See Whitfield v. Spiller*, No. 20-1747, 2023 WL 5013353, at *9 (7th Cir. Aug. 7, 2023) ("If it turns out that an officer imposed the adverse action in response to the protected conduct, then that is the end of the 'retaliatory motive' analysis.")

Having made a prima facie showing of retaliation, the burden shifts to the defendants to rebut the claim, by showing that their action would have occurred regardless of the plaintiff's protected activity. *See Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012). Here, defendants contend that even if plaintiff establishes a prima facie claim of retaliation, his claim fails because the overwhelming evidence shows that they would have denied the promotion to plaintiff regardless of his inmate complaint. In particular, defendants point to: plaintiff's 2019 termination from a part-time housing unit worker 3 position; his history of conduct reports; staff input regarding plaintiff's work habits and personality; and the experience of the inmate ultimately hired.

Even finding that this evidence is strong proof of a lack of causation, however, plaintiff may still demonstrate defendants' proffered reason is pretextual or dishonest, and the plaintiff here has proffered evidence a reasonable jury *could* find undermines each of defendants' purported reasons for denying plaintiff the promotion. For example, his 2019

termination occurred two years before the events in this case, and it did not stop defendants from hiring him, at least for the part-time utility 1 or housing unit worker 3 positions; his conduct reports were likewise months or years before the promotion decision, whereas the conduct reports on the inmate ultimately hired were much more recent; plaintiff's actual supervisor provided him a positive work evaluation, whereas the staff input purportedly relied on by defendants was outdated, vague or unsubstantiated; *and* he had experience equivalent to the inmate who was hired.  In addition, defendants' credibility is undermined by assertions that one of the conduct reports (dkt. #28-9, at 5) and some of the staff input (dkt. #28, ¶ 77) purportedly relied upon in denying plaintiff's promotion occurred *after* that decision was made.  Finally, plaintiff states in his sworn affidavit that defendants filled the full-time position without posting it as required by prison policy, and he only found out about the opening after the position was filled temporarily by an inmate in late-April to early-May.  (Dkt. #41. ¶ 9.)  Perhaps tellingly, defendants also failed to provide any details addressing plaintiff's assertions about the late posting of the position or apparent premature timing of the initial hiring.

Even setting aside this burden shifting analysis and considering the evidence as a whole, which the Seventh Circuit encourages, *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 766 (7th Cir. 2016), the overall evidence is sufficiently muddled to allow a reasonable jury to find for plaintiff.  Thus, based on the record presented at summary judgment at least, the court finds that plaintiff has presented sufficient evidence to create a genuine

dispute of material fact regarding whether defendants denied him a promotion in retaliation for his inmate complaint.[5]

## II. Plaintiffs' Potential Relief and Remaining Issue for Trial

Defendants also move for summary judgment on plaintiffs' requests for compensatory and punitive damages, arguing that even if one of plaintiff's claims survives summary judgment, the court should rule that he cannot recover more than a nominal damage of $1.00. Defendants are correct that plaintiff cannot recover damages for "mental or emotional injury" unless he suffered a "physical injury," but they cite no legal authority precluding plaintiff from recovering other types compensatory damages, such as lost wages to compensate for what he would have earned had he received the promotion. *See* 42 U.S.C. § 1997e(e) ("No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for *mental or emotional injury* suffered while in custody without a prior showing of physical injury….") (emphasis added).

As for punitive damages, plaintiff must advance proof from which a reasonable jury could find that defendants' conduct is shown to be motivated by "evil motive or intent, or when it involves reckless or callous indifference for the federally-protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Viewing the evidence in plaintiff's favor, a reasonable jury could conclude that defendants' acted with reckless indifference to

---

[5] Defendants also makes a superficial qualified immunity argument, but it is completely undeveloped. (Dkt. #26, at 13–14.) In particular, defendants do not explain what part of plaintiff's claim is not clearly established under the long line of First Amendment retaliation decisions in the prison setting. Although the plaintiff has the burden of defeating a qualified immunity defense once raised, *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013), remaining factual uncertainties and defendants' legal boilerplate is not sufficient to prevail at summary judgment.

plaintiff's First Amendment rights by refusing to promote him for his protected inmate complaint. Thus, defendants are not entitled to summary judgment on plaintiff's request for compensatory or punitive damages.

In conjunction with this order, the court is also issuing a Trial Preparation Order that resets the deadlines for trial preparation materials and provides information about the upcoming trial.

ORDER

IT IS ORDERED that:

1. Plaintiff Samterious Gordon's motion for summary judgment (dkt. #39) is DENIED.

2. Plaintiff's motion to preclude reference to a previous job termination (dkt. #38) is DENIED.

3. Defendants' motion for summary judgment (dkt. #25) is GRANTED IN PART and DENIED IN PART. The motion is GRANTED on plaintiff's claim that defendants retaliated by failing to pay him a proper pay rate. The motion is DENIED in all other respects.

Entered this 8th day of September, 2023.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge